## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## DANVILLE DIVISION

| | | |
|---|---|---|
| **ELIZABETH JONES as** | ) | |
| **administrator of the estate of Juan** | ) | |
| **Markee Jones, deceased,** | ) | |
| **Plaintiff,** | ) | **Case No. 4:20-cv-00020** |
| | ) | |
| **v.** | ) | |
| | ) | **By:   Michael F. Urbanski** |
| **THE CITY OF DANVILLE, et al.,** | ) | **Chief United States District Judge** |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This matter is before the court on three motions by defendants the City of Danville ("Danville"), Officer Christopher S. Simpkins, and Officer David J. Branch (collectively "the defendants"): a motion for summary judgment, ECF No. 66; a motion to prohibit extrajudicial statements by attorneys to the media, ECF No. 69; and a motion in limine to exclude Shantaria Plunkett's statement to law enforcement that Jones was unarmed, ECF No. 71. Plaintiff Elizabeth Jones ("plaintiff"), as administrator of the estate of Juan Markee Jones ("Jones"), deceased, opposes each motion. ECF Nos. 78, 81, and 82. The defendants have replied to each. ECF Nos. 84, 85, and 86. For the reasons explained herein, the court will **DENY** the motion in limine to exclude Plunkett's statement, ECF No. 71; **GRANT** the motion for summary judgment on qualified immunity grounds, ECF No. 66; and **DENY** the motion to prohibit extrajudicial statements by attorneys to the media, ECF No. 69.

### I.    BACKGROUND

This case involves the shooting death of an unarmed Black man by two officers of the Danville Police Department ("DPD"). On April 8, 2018, several officers, including

Simpkins and Branch, responded to a report of domestic violence at a home on Sunset Drive. Compl., ECF No. 1, at ¶¶ 49–50. Plunkett had reported to police that Jones had physically assaulted her. When Simpkins arrived at the scene, Jones was in a blue Hyundai Veloster attempting to leave, but Jones was blocked in by police vehicles at one end of the street and a dead end at the other. Id.; see also Simpkins Body Camera Video ("Simpkins Video"), ECF No. 67-1, at 0:32-1:45. Shortly after arriving, Simpkins confirmed with Officer Curt Mitchell that signs of assault were visible on Plunkett's neck. Id. at 2:06-2:09; see also Mitchell Virginia State Police ("VSP") Activity Report, ECF No. 78-8, at 2.

Upon reaching the cul-de-sac where Jones was sitting in the car, Simpkins told the officers that they would "just wait him out." Simpkins Video, ECF No. 67-1, at 2:33-2:35. Simpkins periodically instructed Jones throughout the encounter to go ahead and shut his vehicle off, but Jones did not. About two minutes passed before Jones repositioned his vehicle to face a grassy patch outside of the cul-de-sac rather than the cul-de-sac's center. Id. at 4:30-4:37. Officer Branch arrived around that time. See Branch Body Camera Video ("Branch Video"), ECF No. 67-2, at 0:00-0:45. Simpkins instructed Jones again to shut his vehicle off and said, "It's not going to go the way you think." Simpkins Video, ECF No. 67-1, at 4:54-5:00.

Plunkett then walked over to the cul-de-sac while talking to Jones on her cell phone. Simpkins Video, ECF No. 67-1, at 5:00-5:30. On the body camera footage, Plunkett's end of the conversation can be heard but not Jones's. Id. In her report to state police, Plunkett told officers that Jones asked her not to press charges, but she refused, saying she had "been saving [him] too many times." Plunkett VSP Activity Report, ECF No. 84-1, at 2. Jones

allegedly told Plunkett: "Fore I go to jail and do the 35 years over my head[,] I'll kill myself." Id. Plunkett told the police officers that they had been to this address "numerous times" and an ambulance had been called to the address four days earlier for a "fracture." Simpkins Video, ECF No. 67-1, at 5:30-5:47.

Simpkins then walked up the street to get gloves out of his car in case he and his fellow officers had to "go 'hands on' with" Jones to get him out of the vehicle. Simpkins VSP Activity Report, ECF No. 78-5, at 2. On his way, he met his lieutenant who had just arrived and told him that he did not know if Jones was armed. Simpkins Video, ECF No. 67-1, at 5:50-7:00. While Simpkins was gone, Branch asked his fellow officers if Jones had any weapons in the car, but no one responded. Branch Video, ECF No. 67-2, at 2:13-2:14. A few seconds later, Branch asked Mitchell specifically if Jones had any weapons. Id. at 2:23-2:28. Mitchell asked Plunkett and she responded, "uh-uh, he don't got nothing." Id. at 2:28-2:30. Branch confirmed in his deposition and his state police report that he heard Plunkett advise Mitchell that Jones did not have a weapon. See Branch Dep., ECF No. 78-2, at 97–98; see also Branch VSP Activity Report, ECF No. 78-3, at 1 ("The assault victim came down and when asked she advised the subject had no weapons."). Neither he nor Mitchell communicated this to their fellow officers, though Branch acknowledged that he had time to do so. See Branch Dep., ECF No. 78-2, at 97–98, 112, 114.

Jones next abruptly drove his vehicle out of the cul-de-sac and into a dense thicket of brush, which stopped the vehicle from moving any further. Branch Video, ECF No. 67-2, at 3:08-3:21; see also Simpkins Video, ECF No. 67-1, at 7:05-7:25. Branch and Mitchell ran towards Jones, commanding him to "stay in the car." Branch Video, ECF No. 67-2, at 3:21-

3:25. Branch positioned himself at the rear of the car on the passenger's side and less than ten feet away from the vehicle, drawing his gun as he approached. Id. at 3:25-3:32; see also Branch VSP Activity Report, ECF No. 78-3, at 2–3. Meanwhile, Simpkins ran back to the cul-de-sac, stopping a short distance from the rear end of the car on the driver's side and drawing his weapon. Simpkins Video, ECF No. 67-1, at 7:05-7:25; see also Simpkins VSP Activity Report, ECF No. 78-5, at 2–3. Mitchell estimated that the other officers were about 20 feet away from the vehicle and could see Jones clearly by using their flashlights, though the surrounding area was dark. See Mitchell VSP Activity Report, ECF No. 78-8, at 4.

A few seconds after Simpkins arrived, Jones exited his vehicle. Simpkins Video, ECF No. 67-1, at 7:29. As he exited, Simpkins repeatedly and loudly instructed Jones to "show me your hands" and "do not reach." Id. at 7:40-7:50. Jones did not follow the instructions and instead stood with his hands by his sides and his back to the car. See id. Jones faced away from Branch, who was unable to see Jones's hands. See Branch Video, ECF No. 67-2, at 3:43-3:53; Branch VSP Activity Report, ECF No. 78-3, at 2 ("BRANCH advised from where he was positioned, he could see the subject was wearing a Ken Griffey Mariners shirt. From BRANCH'S angle, he could see from the top of the numbers on the subject's jersey and up. The subject was facing directly away from BRANCH."); id. at 3 ("From where BRANCH was positioned, he could not see the subject's hands at all.").

To the officers on the driver's side of the vehicle, Jones's left hand was visible, but his right hand was not and, at two points, Jones appeared to reach into his pants. See Simpkins Video, ECF No. 67-1, at 7:40-7:50; see also Simpkins VSP Activity Report, ECF No. 78-5, at 3–4. Jones never spoke to the officers. See generally Simpkins Video, ECF No.

67-1; <u>see also</u> Simpkins VSP Activity Report, ECF No. 78-5, at 4 ("The subject never said anything."); Mitchell VSP Activity Report, ECF No. 78-8, at 4 ("While MITCHELL was on scene, any words spoken by the suspect were between him and the female victim."). One officer told Jones "it's not even that serious" and to "come on, man." Simpkins Video, ECF No. 67-1, at 7:50-7:53.

After a few more seconds of loudly instructing Jones to show his hands with no success, Lieutenant Brad Robertson instructed Officer Frank Hudgins to tase Jones. <u>Id.</u> at 7:54-8:00; <u>see also</u> Robertson Dep., ECF No. 78-6, at 15; Simpkins VSP Activity Report, ECF No. 78-5, at 5. Hudgins attempted to tase Jones and Jones jolted slightly but Hudgins audibly declared the taser was "ineffective." Simpkins Video, ECF No. 67-1, at 8:00-8:03.

Suddenly, Jones turned and quickly swung both arms in unison towards the officers on his left side. <u>Id.</u> at 8:03-8:05; <u>see also</u> Branch Video, ECF No. 67-2, at 4:10-4:12. In the body camera videos, he rapidly reaches out with both arms and appears to point something towards the officers. Simpkins Video, ECF No. 67-1, at 8:03–8:05; <u>see also</u> Branch Video, ECF No. 67-2, at 4:10-4:12; Enhanced Simpkins Video, ECF No. 67-4; Enhanced Branch Video, ECF No. 67-5.[1] In that moment, the officers believed that Jones was opening fire at them. <u>See, e.g.</u>, Robertson Aff., ECF No. 67-6, at 2–3 ("Instead of complying, Jones quickly swung his body around, put his hands together out in front of him, and took a stance like he was pointing a weapon at us. I heard a shot and immediately went to the ground as I thought

---

[1] The "enhanced" videos were prepared by Randy Ferguson. Ferguson Report, ECF No. 67-3, at 1. Ferguson explains in his report that he "enhanced" the videos by "enlarg[ing] and us[ing] slow motion on the section of the footage where shots are fired." <u>Id.</u> at 4. He states that "[a]t no point did [he] improperly alter, modify, or change the content of these files in a manner that would modify the video images originally recorded to portray an instance or phenomenon that did not occur in real time on April 8, 2018." <u>Id.</u> at 1. The plaintiff does not contest this.

Jones had opened fire upon us....Based on Jones's actions and movements, I was certain that he possessed a weapon and fired first."); Branch VSP Activity Report, ECF No. 78-3, at 3 ("When asked, BRANCH advised when the subject made this movement, he still could not see his hands.... BRANCH said when this happened he thought the subject had just fired a shot at the other three officers."); Simpkins VSP Activity Report, ECF No. 78-5, at 4 ("When SIMPKINS saw this quick movement and thought he saw the gun, he fired the two shots."); Mitchell VSP Activity Report, ECF No. 78-8, at 5 ("When asked, MITCHELL advised he did not see a gun that he recalled, but he thought there was one being drawn."). Simpkins and Branch both shot at Jones. Simpkins VSP Activity Report, ECF No. 78-5, at 3. Four shots rang out. See Simpkins Video, ECF No. 67-1, at 8:04-8:06. The officers shot Jones twice in the trunk of his body—once in the chest with the direction of wounding traveling from front to back and once in the back with the direction of wounding traveling from back to front. See Virginia Dept. of Health Autopsy Report, ECF No. 78-9, at 3; see also Ohanessian Dep., ECF No. 78-10, at 54–64. Jones dropped to the ground. Simpkins Video, ECF No. 67-1, at 8:06. Simpkins and another officer both yelled out that they had "one down." Id. at 8:07-8:10. The officers saw Jones moving and again loudly told him to show them his hands. Id. at 8:10-8:25. On the body camera videos, Jones can be heard gasping. Id.; see also Branch Video, ECF No. 67-2, at 4:22-4:24.

Simpkins gradually approached Jones, saw Jones had two gunshot wounds to the chest, and called emergency medical services ("EMS") to the scene. Simpkins Video, ECF No. 67-1, at 8:25-9:05. After confirming that he could not see a gun in Jones's hands and loudly instructing Jones not to move a few more times, Simpkins attempted to reach Jones

through the brush, see where Jones was hit, and look for a weapon. Id. at 8:53-10:50; see also Branch Video, ECF No. 67-2, at 5:49-6:16. The officers seemed all but certain that Jones had a weapon, asking each other about finding "the gun" and "the weapon." Simpkins Video, ECF No. 67-1, at 10:50-11:53; see also Branch Video, ECF No. 67-2, at 6:17-8:10; Simpkins VSP Activity Report, ECF No. 78-5, at 5 ("SIMPKINS said he thought the subject had a gun and thought they would have found the gun right next to him."). Simpkins asked if EMS was on the way as two other officers attempted to remove Jones's shirt, noting that Jones was "going out" and repeatedly saying, "come on, brother" and "stay with me." Simpkins Video, ECF No. 67-1, at 11:53-12:15. EMS arrived within five minutes of the shooting. Id. at 12:52.

About a minute after EMS took over, the officers began searching for a weapon. Id. at 13:42. At some point, Branch asked, "did he throw it?" Branch Video, ECF No. 67-2, at 10:57-11:05. Later, another officer asked, "y'all find that gun?" and the officers said they were still looking. Simpkins Video, ECF No. 67-1, at 15:35-15:39; Branch Video, ECF No. 67-2, at 11:42-11:45. As they continue to search, one officer asked if the gun may have ended up hanging in one of the surrounding trees. Branch Video, ECF No. 67-2, at 13:17-13:27. Branch later asked if Jones put the gun back in his pants, but Simpkins responded that he did not believe that Jones would have had time to do so. Id. at 14:32-14:42.

After looking for five minutes, the officers began to question whether Jones shot at them. Simpkins Video, ECF No. 67-1, at 18:40-18:48. Simpkins said, "he had something," and Branch said, "he shot, I heard it." Id.; see also Branch Video, ECF No. 67-2, at 14:46-14:55. Branch later asked if they would be able to get a metal detector or a firearms dog to

help search for the gun through the brush. Branch Video, ECF No. 67-2, at 16:30-16:42.

Later, Branch says he "heard a pop before anyone started shooting" and another officer says

he did, too. Id. at 17:32-17:37; see also Branch VSP Activity Report, ECF No. 78-3, at 2

("After hearing the second shot, BRANCH said he fired and the subject fell over."). After

three more minutes of searching, the officers started counting the number of shots they

heard, trying to align that with the number of shots they each fired. Simpkins Video, ECF

No. 67-1, at 21:25-22:00; see also Branch Video, ECF No. 67-2, at 17:38-17:53. Simpkins

said he shot twice and Branch said he shot once and then later says he shot once as he was

going down. Simpkins Video, ECF No. 67-1, at 21:25-22:00; see also Branch Video, ECF

No. 67-2, at 17:38-17:53.

    The officers stopped searching after about ten minutes. Simpkins Video, ECF No.

67-1, at 23:25. One officer said he "wish[ed] [they] could find a gun" and another replied,

"yes." Id. at 23:42-23:44. Another officer said, "it's in there." Id. at 23:44. Simpkins twice

said, "I swear I saw a gun" and another said "I did, too." Id. at 23:45-23:50. A couple

officers said, "he shot." Id. at 23:51-23:54. Simpkins said that "he turned" and "he reached."

Id. at 23:54-24:00.

    Jones died at the hospital later that morning as a result of the shooting. Compl., ECF

No. 1, at ¶ 56. On April 3, 2020, plaintiff filed a six-count complaint alleging a deprivation of

civil rights in violation of 42 U.S.C. § 1983 against all defendants (Count I); a survival action

against all defendants (Count II); a wrongful death action against all defendants (Count III);

an excessive force and police brutality claim against all defendants (Count IV); a claim for

negligent training, supervision, and retention and inadequate policies, training, and

procedures in violation of 42 U.S.C. § 1983 against the City of Danville (Count V); and a violation of the Virginia Constitution's due process protections against all defendants (Count VI). Id. at 9–14.

## IV.    MOTION IN LIMINE TO EXCLUDE PLUNKETT'S STATEMENT

### A.    Federal Rules of Evidence 401, 402, and 403

The defendants move to exclude Plunkett's statement to Branch that Jones was not armed at the time of his arrest, invoking Federal Rules of Evidence 401, 402, and 403. Rule 402 dictates that "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Rule 401 defines relevant evidence as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence," and "the fact is of consequence in determining the action." Fed. R. Evid. 401.

Some evidence may be relevant but still inadmissible if its benefits are outweighed by certain costs. Rule 403 instructs that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Under Rule 403, "unfair prejudice" means "an undue tendency to suggest a decision on an improper basis," such as "an emotional one." Id. The "mere fact that the evidence will damage the defendant's case is not enough—the evidence must be unfairly prejudicial, and the unfair prejudice must substantially outweigh the probative value of the evidence." United States v. Hammoud, 381 F.3d 316, 341 (4th Cir. 2004) (en banc) (internal quotation marks omitted; emphasis in original), vacated on other grounds, 543 U.S. 1097 (2005), relevant part of prior opinion

reinstated, 405 F.3d 1034 (4th Cir. 2005); accord United States v. Grimmond, 137 F.3d 823, 833 (4th Cir. 1998) (explaining that "[e]vidence that is highly probative invariably will be prejudicial to the defense," but that Rule 403 only excludes "unfair" prejudice).

### B.  Analysis

The defendants argue that plaintiff should be prohibited from introducing Plunkett's statement that Jones was not armed at the time of his arrest because "her belief is irrelevant to this proceeding, it is not properly a part of the calculus for determining objective reasonableness once Danville Officer[s] were confronted with the 'shooting stance' Jones took, and any potential probative value of such evidence is substantially outweighed by its undue prejudice or its potential to mislead the jury." Mem. in Support of Mot. to Exclude Plunkett's Statement, ECF No. 72, at 3. Plaintiff argues that the statements are plainly relevant under Fourth Circuit law and allowing the defendants to delete Plunkett's statements from the body cam footage will "distort the facts and erase the reality of that night." Mem. in Opp'n to Mot. to Exclude Plunkett's Statement, ECF No. 82, at 6. The defendants argue in reply that the cases on which plaintiff relies are clearly distinguishable. Reply in Support of Mot. to Exclude Plunkett's Statement, ECF No. 86, at 3–5.

The court finds this evidence is admissible and will **DENY** the defendants' motion. Plunkett's statement that Jones was unarmed is plainly relevant to the officers' state of mind at the time of the shooting and whether the officers' use of lethal force was reasonable or excessive. Other Fourth Circuit cases involving excessive force allegations have considered statements regarding whether the plaintiff or decedent was unarmed. In Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002), the Fourth Circuit denied qualified immunity where,

among other things, plaintiff's wife told officers that her husband, who was suffering from dementia and other ailments, was unarmed. In <u>Streater v. Wilson</u>, 565 F. App'x 208, 209–11 (4th Cir. 2014), the Fourth Circuit again denied qualified immunity where an officer told a minor to drop a knife and the minor responded, "Didn't you just see me drop the knife?," holding that the officer could not have reasonably believed that lethal force was justified under those circumstances. Both of those cases support the general proposition that Plunkett's statement is relevant to the officers' decision to use lethal force. Plunkett's statement is also not unduly prejudicial. It is one of many relevant factors. A jury can fairly balance Plunkett's belief with those other factors and decide whether the officers' conduct was reasonable. The court will also consider this evidence in deciding the defendants' motion for summary judgment.

### III.     MOTION FOR SUMMARY JUDGMENT

#### A.     Summary Judgment Standard

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Glynn v. EDO Corp.</u>, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. <u>Celotex</u>, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no

reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

### B.   Qualified Immunity

The defendants move for summary judgment on the grounds that they are entitled to qualified immunity. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "Awarding the officers summary judgment on qualified immunity grounds is only appropriate if they demonstrate 'that there is no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law.' Estate of Jones by Jones v. City of Martinsburg, W. Virginia, 961 F.3d 661, 667 (4th Cir. 2020), as amended (June 10, 2020) (citing Fed. R. Civ. P. 56(a)). This court must view the evidence in the light most favorable to the plaintiff and draw any reasonable inferences in her favor. See id.; see also Purnell, 652 F.3d at 531. At the same time, recognizing that police officers often must make "split-second judgments" in "tense, uncertain, and rapidly evolving" situations, courts must "take care to consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the '20/20 vision of hindsight.'" Clem, 284 F.3d at 550.

To determine whether qualified immunity applies, courts "apply a two-step inquiry, in either order: (1) whether a constitutional violation occurred; and (2) whether the right was clearly established at the time of the violation…." Jones, 961 F.3d at 667; see also Saucier v Katz, 533 U.S. 194 (2001). For the first question, a "claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of [a] person" is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1989); see also Scott v. Harris, 550 U.S. 372, 381 (2007). Applying the objective reasonableness standard "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015) (quoting Graham, 490 U.S. at 396). The court considers three factors to guide this balancing, including (1) "the severity of the crime at issue," (2) the extent to which "the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Estate of Armstrong ex rel. Armstrong v. Village of Pinehurst, 810 F.3d 892, 899 (4th Cir. 2016) (quoting Ray, 781 F.3d at 101). These factors are analyzed using "the information possessed by the officer at the moment that force is employed." Purnell, 652 F.3d at 531.

An intrusion on Fourth Amendment rights is "unmatched" when deadly force is used, and "[s]uch force is therefore justified only where a reasonable officer would have sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." Clem, 284 F.3d at 550 (internal citations and quotation marks omitted). "Where

the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." Tennessee v. Garner, 471 U.S. 1, 11 (1985).

In the second step of the Saucier analysis, a court must determine whether the constitutional right at issue was clearly established at the time of the alleged violation. "[T]his is not a mechanical exercise, and…the test is not whether 'the very action in question has previously been held unlawful,' but rather, whether preexisting law makes the unlawfulness of an act 'apparent.'" Clem, 284 F.3d at 553 (emphasis in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Accordingly, a "constitutional right is clearly established for qualified immunity purposes not only when it has been 'specifically adjudicated' but also when it is 'manifestly included within more general applications of the core constitutional principle invoked.'" Clem, 284 F.3d at 553 (quoting Buonocore v. Harris, 65 F.3d 347, 357 (4th Cir. 1995)).

### C. Analysis

Two of the three factors this court must consider—"the severity of the crime at issue" and "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight"—weigh in favor of some use of force. Armstrong, 810 F.3d at 899. Jones had been accused of violent conduct and at least one officer confirmed that some signs of assault were visible on Plunkett's neck upon arriving at the scene. Jones was also actively resisting arrest, not complying with orders, and had tried to flee the scene in his vehicle.

It is the second factor—the extent to which "the suspect poses an immediate threat to the safety of the officers or others"—and the lethal level of force used that are

determinative here. Id. The court must decide whether the officers were justified in using lethal force against Jones when he turned and abruptly pointed his arms towards them in the manner shown on the body camera footage. The defendants argue that the officers' use of force against Jones was objectively reasonable under the circumstances, as the officers did not know Jones was unarmed, he was acting erratically, he would not comply with commands, the officers' attempted use of a taser was ineffective, and Jones quickly swung his arms in the direction of the officers on the driver's side of the vehicle in such a way that they reasonably believed Jones was going to shoot at them. The plaintiff argues that the officers' use of force[2] was clearly excessive since Jones was stationary, nonresponsive, unarmed, outnumbered, and surrounded, analogizing primarily to Armstrong, 810 F.3d at 899.

In this case, the body camera videos show that the officers' actions were objectively reasonable. Jones had been accused of violent conduct against Plunkett and was fleeing from the officers in a vehicle. Jones stepped out of the vehicle after driving his car into a dense thicket of brush in an apparent attempt to escape. The officers repeatedly told Jones to show them his hands, but he did not. Instead, he stood at an angle with his back against the

---

[2] The plaintiff's complaint challenges the lethal shooting of Jones by Simpkins and Branch, not the taser as deployed by Hudgins and ordered by Robertson. In their opposition to the motion for summary judgment, the plaintiff argues that the officers' use of a taser prior to the shooting was unwarranted under DPD policy and Armstrong, 810 F.3d 892. Mem. in Opp'n, ECF No. 78, at 13–14. At oral argument, plaintiff's counsel confirmed that plaintiff's constitutional claims only concern the shooting death of Jones and not the prior taser use, but counsel argued that the allegedly unwarranted taser use should be considered under the totality of the circumstances. The court has considered the taser use accordingly and notes that the DPD policy allows for taser use when "the subject has demonstrated, by words or action, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm officers, him/herself or others." DPD Policy Manual, ECF No. 78-11, at 75. Ultimately, the court finds that the officers' failed taser use weighs in the officers' favor in that (1) the officers reasonably believed that Jones was resisting arrest and reaching for a weapon when Hudgins deployed the taser upon Robertson's command, and (2) the officers attempted to use non-lethal force before using lethal force once Jones swung his arms in their direction in such a way that they perceived he was opening fire on them.

vehicle and one hand at his waist, blocked from the officers' view. At this point, the officers feared he had a weapon and he was continuing to not comply with orders, so they attempted to tase him, but the taser was ineffective. Jones then quickly swung both of his arms together in the direction of the officers, in a motion that looked very much like he was firing a gun.

Plaintiff's counsel does not address Jones's arm swing in their opposition brief. Plaintiff' counsel frames this case as an incident where an unarmed Black man was shot in the back by officers who knew or should have known he was unarmed but did not like his silence and the way he looked at them. See generally Mem. in Opp'n, ECF No. 78. The opposition brief describes the moments prior to the shooting as follows:

> It was not until he was tased did Jones react at all. It was the Danville police officers who escalated this encounter. After being "jolted", Jones turns towards the officers. As he turns, Officers Simpkins and Branch shoot him.

Mem. in Opp'n, ECF No. 78, at 17–18.

This would be a different case if Jones had turned towards the officers and nothing more and was then shot in the back, but plaintiff's counsel's characterization is incomplete. The circumstances of the shooting are clear from the body camera videos. The opposition to the motion for summary judgment does not address Jones's positioning prior to the shooting, his noncompliance with requests to show his hands, the officers' reasonable perception that Jones was reaching for a weapon, Jones's quick arm swing, or the fact that Jones was also shot in the chest. In their opposition brief and at the hearing, plaintiff's counsel focused on the fact that Jones was shot in the back, but the body camera footage shows that this was not because Jones was shot while fleeing or some other non-threatening motion. Rather, Branch was positioned in such a way that Jones's back was to him when he

thought Jones was shooting at his fellow officers. At this stage of the litigation, the court views the facts in the light most favorable to the plaintiff, but it cannot ignore the ways in which the body camera videos do not align with plaintiff's counsel's version of the story. It is clear now that Jones was unarmed, making his arm movements inexplicable. The court has considered that perhaps Jones was raising his hands to comply with the officers' directives but, if so, his manner of doing so remains difficult to understand. Jones did not raise his hands above his head in a vertical motion. Instead, the body camera videos show that Jones quickly swung his outstretched arms towards the officers as if he were pointing a firearm at them, and the officers reasonably interpreted his movements as a "classic shooting stance." Robertson Aff., ECF No. 67-6, at 3–4; see also Combs Report, ECF No. 67-7, at 7.

Taking the facts in the light most favorable to the plaintiff, the court finds that Mitchell had time to tell his fellow officers that Plunkett said that Jones did not have a weapon, and that all officers could have approached the encounter with that knowledge. But Plunkett's statement is not dispositive. As this court has already ruled, her statement is undoubtedly relevant to the officers' mindset and the reasonableness of their decisions, but the officers could not be bound by her statement because it may not have been true. Here, even if all the officers had heard Plunkett say that Jones did not have a weapon, Jones's own conduct renders the officers' response objectively reasonable. As Robertson explained:

> At the time, Officers Simpkins and Branch discharged their weapons, I was not aware that Ms. Plunkett thought Jones was not armed. Even if a third party has reason to believe a suspect is unarmed, officers cannot rely on that information for everyone's safety. Instead, officers must rely on the behavior of the suspect. In this case, Jones's behavior was unpredictable, and his refusal to show his hands increased our concern that he was holding a weapon. Jones's sudden turn with his arms outstretched and his hands together was the classic shooting stance for a person holding a pistol.

Robertson Aff., ECF No. 67-6, at 3–4; see also Combs Report, ECF No. 67-7, at 7 ("The manner in which Jones abruptly, dynamically, and with distinctive purpose, brought his hands up together in front of his body pointing in the direction of the officers is consistent with a classic shooting stance….").

The plaintiff principally relies on Armstrong, 810 F.3d 892, but this case is distinguishable from Armstrong in important ways. In that case, the Fourth Circuit found that the decedent's constitutional rights were violated when he was tased repeatedly though he was a "mentally ill man being seized for his own protection, was seated on the ground, was hugging a post to ensure his immobility, was surrounded by three police officers and two Hospital security guards, and had failed to submit to a lawful seizure for only 30 seconds." Id. at 906. To be sure, the Fourth Circuit later described the constitutional right at issue to be "Armstrong's right not to be subjected to tasing while offering stationary and non-violent resistance to a lawful seizure." Id. at 907. The plaintiff also highlights the Fourth Circuit's point in Armstrong that "[t]he degree of force necessary to prevent an individual who is affirmatively refusing to move from fleeing is obviously quite limited." Id. at 901. But the Fourth Circuit made clear that Armstrong was a case involving a "static stalemate with few, if any exigencies" and "not an immediate danger." Id. at 906. That is not this case. Here, the officers pursued Jones after he attempted to flee by driving his car into brush and ordered Jones to show his hands. Jones did not do so, keeping his right hand by his side and out of the officers' sight. Jones then quickly raised both of his arms in their direction as if he were pointing a weapon at them. Plainly, this situation was not a "static stalemate" with few exigencies and no immediate danger. Id.

19

Rather, this case is more akin to cases like Anderson v. Russell, 247 F.3d 125 (4th Cir. 2001), and Slattery v. Rizzo, 939 F.2d 213 (4th Cir. 1991). In Russell, 247 F.3d at 132, the Fourth Circuit found that the use of deadly force against the plaintiff, who was unarmed at the time, was reasonable because the officer reasonably believed he was reaching for a gun. The court held that the evidence conclusively established that the officer reasonably perceived Anderson to be armed with a gun given a bulge near his waistband, and Anderson conceded that, immediately before the officer fired, "Anderson was lowering his hands in the direction of the bulge in disregard of the officers' order." Id. at 130. In Rizzo, 939 F.2d at 215–16, the Fourth Circuit held that deadly force was appropriate when the suspect failed to comply with the officer's order to raise his hands and the officer reasonably believed the suspect to be coming at him with a weapon, although the "weapon" turned out to be a beer bottle. See also McLenagan v. Karnes, 27 F.3d 1002, 1007 (4th Cir. 1994) (finding officer was entitled to use deadly force when the officer had reason to believe, but could not confirm, the suspect was armed); Greenidge v. Ruffin, 927 F.2d 789, 792 (4th Cir. 1991) (affirming judgment for officer although officer was unable to confirm the nature of the weapon at issue, which turned out to be a wooden nightstick, before using deadly force).

After Armstrong, the plaintiff principally relies on Clem, 284 F.3d 543, and Streater, 565 F. App'x 208.[3] But Clem dealt with an older man suffering from dementia and other ills

---

[3] The plaintiff also invokes Graham v. Connor, 490 U.S. 386, 396, 399 (1989) and Meyers v. Baltimore Cty., 713 F.3d 723, 732–33 (4th Cir. 2013) to argue that the officers' use of force was not objectively reasonable but rather "unnecessary, gratuitous, and disproportionate." In Graham, 490 U.S. at 388–90, 399, a case involving law enforcement officers' use of injurious, physical force against a man having a diabetic episode, the Supreme Court established the objective reasonableness standard for excessive force claims under the Fourth Amendment. The objective reasonableness of the officers' use of force in this case is addressed throughout this section. In Meyers, 713 F.3d at 732–33, the Fourth Circuit found that the officer's first three taser deployments were reasonable but seven additional shocks after the subject was on the ground

who was not under arrest. More importantly, in <u>Clem</u>, the Fourth Circuit found that, "during the crucial moments immediately before the shooting, again both [officers] testified that Clem's hands were obviously empty, and that Clem never reached into his pockets or clothing," and one officer testified that he believed throughout the encounter that Clem did not have a weapon. 284 F.3d at 551. In <u>Streater</u>, the court found that an officer was not entitled to qualified immunity when he shot a minor because the minor had clearly disarmed himself by dropping the knife he was holding. 565 F. App'x at 211. In fact, he complied with the officer's request to disarm himself and did so with sufficient time to rhetorically ask if the officer saw him drop the knife, all before the officer shot him four times. <u>Id.</u> at 209.

To be sure, the Fourth Circuit has made clear that mere possession of a gun is not enough to justify a police officer's use of deadly force. <u>See</u> <u>Cooper v. Sheehan</u>, 735 F.3d 153, 159 (4th Cir. 2013); <u>Hensley on behalf of North Carolina v. Price</u>, 876 F.3d 573, 585 (4th Cir. 2017). Rather, "deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is <u>threatened</u> with the weapon." <u>Cooper</u>, 735 F.3d at 159 (emphasis in original). The Fourth Circuit has found that mere possession of a weapon did not justify the use of deadly force when the subject "never raised the gun, never threatened the Deputies, and never received a warning command." <u>Hensley</u>, 876 F.3d at 586; <u>see also</u> <u>Betton v. Belue</u>, 942 F.3d 184, 193 (4th Cir. 2019) ("[H]ad Betton disobeyed a command given by the officers, such as to drop his weapon or to 'come out' with his hands raised, Officer Belue reasonably may have feared for his safety upon observing Betton holding a gun at his side."). While Jones never verbally threatened the

and secured were unconstitutional. Here, the officers reasonably believed they were meeting lethal force with lethal force, they fired four shots, and they did not continue firing after Jones dropped to the ground.

officers, their conduct was objectively reasonable based on his conduct, including his attempts to flee and his failure to heed instructions to show his hands, followed by the quick movement of his arms together in the direction of the officers in a classic shooting stance.

In short, "this Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." Russell, 247 F.3d at 131 (collecting cases). Here, the officers did not shoot until they believed a gun was pointed at them or, in Branch's case, at his fellow officers. The Fourth Circuit has "further held that an officer is not required to see an object in the suspect's hand before using deadly force." Id. (collecting cases). "Accordingly, because [the officers] had sound reason to believe that [Jones] was armed, [the officers] acted reasonably by firing on [Jones] as a protective measure before directly observing a deadly weapon" once the officers saw Jones swing his arms in their direction as if he were shooting at them. Id.

The body camera videos show that the officers shot Jones after he swung his arms in their direction in what the officers reasonably perceived to be a classic shooting stance. Based on Jones's actions on the videos, the officers objectively and reasonably believed that he posed an immediate a threat to their safety and the safety of the community. They were tragically mistaken. Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Ray, 781 F.3d at 100 (quoting Stanton v. Sims, 571 U.S. 3, 5 (2013) (per curiam)). Based on the court's review of the body camera videos, the court finds that the officers' actions were objectively reasonable and did violate Jones's constitutional rights. This is a clear case for the application of qualified immunity. As such, the court will

**GRANT** the defendants' motion for summary judgment on qualified immunity grounds.[4]

Though the court finds that the officers acted as reasonable officers would under the

circumstances and they are protected by qualified immunity, that does not mean that Jones's

death is not a grievous and devastating tragedy. It is a tragedy not just for himself and his

family, but for our entire community.

### D.    Jones's State Law Claims

The defendants move to dismiss the plaintiff's state law claims on the grounds that

they cannot succeed when plaintiff's federal constitutional claims fail. "It has been well

established that the decision to exercise supplemental jurisdiction [over a state law claim]

after a federal claim has been dismissed, rests within the sole discretion of the Court." Davis

v. York Cnty. Bd. of Supervisors, No. 4:17-cv-00039, 2017 WL 6397833, at *9 (E.D. Va.

Sep. 7, 2017) (quoting Jones v. Tyson Foods, 378 F. Supp. 2d 705, 710 (E.D. Va. 2004)). In

exercising its discretion, the court should consider "convenience and fairness to the parties,

the existence of any underlying issues of federal policy, comity, and considerations of judicial

economy." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995). "Here, the dismissed

federal claims are closely connected to the state claims," and, therefore, "all three factors

weigh in favor of addressing the state law causes of action." Bethea v. Howser, 447 F. Supp.

---

[4] Even if the court were to find that Jones's constitutional rights were violated, the court finds that this right was not "clearly established" at the time Jones was killed on April 8, 2018. "The dispositive question is whether the violative nature of particular conduct is clearly established…in light of the specific context of the case…." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (internal citations and quotations omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). Here, the court must determine whether, as of April 8, 2018, relevant precedent established that an officer's use of lethal force is objectively unreasonable and thus constitutionally excessive when used against an individual who is resisting arrest, appears to be reaching for a firearm though the officers have been told that he does not have one, and suddenly turns with his arms outstretched and his hands together in what the officers perceive to be a classic shooting stance. The court has found no such precedent.

3d 497, 516 (E.D. Va. 2020) (citing <u>Hardin v. Belmont Textile Mach. Co.</u>, 355 Fed. App'x

717, 723 (4th Cir. 2009) (unpublished)).

The court will dismiss plaintiff's state constitutional claim (Count VI) for failure to

reference a relevant self-executing provision of the Virginia Constitution. "In order to

maintain a private cause of action under the Virginia Constitution, the plaintiff must

reference a self-executing provision of the Virginia Constitution or 'associated legislation'

permitting a private cause of action." <u>Edwards v. Reynolds</u>, 7:19CV00765, 2021 WL

1206414, at *6 (W.D. Va. Mar. 30, 2021) (citing <u>Delk v. Moran</u>, 7:16CV00554, 2019 WL

1370880, at *4 (W.D. Va. Mar. 26, 2019)).[5] Count VI generally references due process rights

under Article I of the Constitution of Virginia, which is the Commonwealth's entire Bill of

Rights. <u>See</u> Compl., ECF No. 1, at 14. Article 1, Section 11[6] "is Virginia's Due Process

Clause and is self-executing 'only in the context of claims of damages to or takings of

property.'" <u>Delk</u>, 2019 WL 1370880, at *4 (quoting <u>Quigley v. McCabe</u>, No. 2:17cv70, 2017

WL 3821806, at *5 (E.D. Va. Aug. 30, 2017)); <u>see also</u> <u>Doe v. Rector & Visitors of George</u>

<u>Mason Univ.</u>, 132 F. Supp. 3d 712, 728 (E.D. Va. 2015) ("Although the due process

provision of the Virginia Constitution is self-executing, this has only been held to be true

with regard to property deprivation."). Plaintiff's "claims do not implicate damages to or

takings of property" and cannot survive. <u>Delk</u>, 2019 WL 1370880, at *4.

---

[5] The Virginia Legislature recently passed a statute prohibiting the use of deadly force against a person unless certain requirements are met, including the immediate necessity of such force, the feasibility of providing a warning, the reasonableness of deadly force under the totality of the circumstances, and the exhaustion of alternative options. Va. Code § 19.2-83.5. However, this statute did not take effect until March 1, 2021.

[6] Article I, section 11 of the Constitution of Virginia states in relevant part "[t]hat no person shall be deprived of his life, liberty, or property without due process of law."

The court will also dismiss the plaintiff's other state law claims, which include survival and wrongful death claims (Counts II and III) because the court has already found that the defendants' actions were objectively reasonable under the circumstances and protected by qualified immunity. See, e.g., Milstead v. Kibler, 91 F. Supp. 2d 895, 901 (W.D. Va. 2000), affirmed 243 F.3d 157 (4th Cir. 2001) ("If the Fourth and Fourteenth Amendment claims are decided in favor of defendants on their motion for summary judgment, the state law claims should also be dismissed."); Russell v. Wright, 916 F. Supp. 2d 629, 645 (W.D. Va. 2013) ("Moreover, a favorable ruling for the defendant on an excessive force claim brought under § 1983 requires dismissal of the state law claims as well."). In Sigman v. Town of Chapel Hill, 161 F.3d 782, 789 (4th Cir. 1998), the Fourth Circuit held that because it "concluded that [the officer's] actions were, as a matter of law, reasonable in the circumstances of this case [under a § 1983 analysis], they cannot be negligent or wrongful, as required by N.C. Gen.Stat. § 28A–18–2(a)." The same is true for the plaintiff's survival and wrongful death actions brought pursuant to Virginia Code §§ 8.01-25 (survival of causes of action) and 8.01-50 (explaining how and when wrongful death actions may be brought, including "[w]henever the death of a person shall be caused by the wrongful act, neglect, or default of any person or corporation, or of any ship or vessel").[7]

---

[7] The defendants also argue that Jones's state law survival and wrongful death claims, as alleged against the City of Danville, should be dismissed because Jones's estate did not provide the notice required under Virginia Code § 15.2-209. See Whitfield Aff., ECF No. 67-8, at 2. Plaintiff argues that this notice requirement does not apply because Virginia Code § 15.2-209 only applies to negligence actions, and her wrongful death claims are not negligence claims. This is incorrect. "A wrongful death claim is the vehicle for a posthumous negligence claim." Darlington v. Harbour E. Village LLC, 3:20CV157-HEH, 2020 WL 3979664, at *4 (E.D. Va. July 14, 2020), appeal dismissed, 20-1864, 2020 WL 8465466 (4th Cir. Nov. 17, 2020) (citing Miller v. United States, 932 F.2d 301, 303 (4th Cir. 1991) ("Virginia's wrongful death statute does not create a new cause of action, but only a right of action in a personal representative to enforce the decedent's claim for any personal injury that caused death.")).

## IV.   MOTION TO PROHIBIT EXTRAJUDICIAL STATEMENTS

### A.   Legal Standard for Prohibiting Extrajudicial Statements

The defendants have also filed a "motion in limine prohibiting extrajudicial statements by attorneys," ECF No. 69. The plaintiff, responding in opposition, correctly characterizes the defendants' motion as a request for a gag order. Mem. in Opp'n to Motion to Prohibit Extrajudicial Statements, ECF No. 81. "Even among First Amendment claims, gag orders warrant a most rigorous form of review because they rest at the intersection of two disfavored forms of expressive limitations: prior restraints and content-based restrictions." In re Murphy-Brown, LLC, 907 F.3d 788, 796–97 (4th Cir. 2018). Prior restraints bear "a heavy presumption against [their] constitutional validity." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963). Also, "gag orders are presumptively unconstitutional because they are content based." In re Murphy-Brown, LLC, 907 F.3d at 797 (citing Nat'l Inst. of Family and Life Advocates v. Becerra, —— U.S. ——, 138 S.Ct. 2361, 2371 (2018) (presumption against content-based restraints)). "In light of these twin presumptions, gag

---

The evolution of the statute also makes this clear. In 2007, "the notice provisions relating to counties, cities, and towns were moved and reworked by the General Assembly from Code § 8.01-222 to Code § 15.2-209." Dixon v. City of Chesapeake, 93 Va. Cir. 426, 2016 WL 9631309, at *2 (Va. Cir. 2016) (unpublished). The now-repealed Virginia Code § 8.01-222 (emphasis added) previously stated that "[n]o action shall be maintained against any city or town for injury to any person or property or for wrongful death alleged to have been sustained by reason of the negligence of the city or town, or of any officer, agent or employee thereof" unless written notice of the claim was provided within six months. The revised Virginia Code § 15.2-209(A) now provides that "[e]very claim cognizable against any county, city, or town for negligence shall be forever barred unless" the statute's notice requirements are satisfied. In short, the statute's language is now broader, not narrower.

However, the revised statute notes that failure to provide a written statement of a claim will not defeat the claim "provided that the attorney, chief executive, or mayor of such locality, or any insurer or entity providing coverage or indemnification of the claim, had actual knowledge of the claim, which includes the nature of the claim and the time and place at which the injury is alleged to have occurred, within six months after such cause of action accrued." Id. Given the publicity surrounding this shooting and the protests that followed, see generally Articles, ECF No. 70-1, it seems unlikely that the parties mentioned in the statute did not have actual knowledge of the claim, but the court declines to rule either way on the notice arguments given the absence of briefing and evidence on this issue and the fact that the court will dismiss these claims on other grounds.

orders must survive strict scrutiny." In re Murphy-Brown, LLC, 907 F.3d at 797 (citing Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015)).

### B.    Analysis

The defendants argue that "the nature of this case and the pretrial publicity that has already occurred, together with the anticipated publicity from trial, demonstrate the need for court intervention to guide the conduct of counsel and those associated with them to avoid lowering the level of advocacy in this case." Mem. in Support of Mot. to Prohibit Extrajudicial Statements, ECF No. 70, at 2. The plaintiff argues that, thus far, the only information provided to the public about the shooting has come from the Danville Police Department, which shared Simpkin's body camera footage but not Branch's or any other officer's. Mem. in Opp'n to Mot. to Prohibit Extrajudicial Statements, ECF No. 81, at 4–5. Accordingly, the only footage the public has does not make clear that Plunkett told Branch that Jones was unarmed. Id. According to plaintiff, her attorneys "should not be restricted from speaking publicly about this critical fact should the occasion arise." Id. at 5. In reply, the defendants argue that "the manner in which counsel for Plaintiff has couched his position places great emphasis on editorial and inflammatory comments that are subject to the Court's restriction from the public light, particularly through the media." Reply in Support of Mot. to Prohibit Extrajudicial Statements, ECF No. 85, at 2.

The court finds that the defendants have failed to show that the order they request would pass constitutional muster. "Strict scrutiny first requires that a gag order serve a 'compelling' public interest." In re Murphy-Brown, LLC, 907 F.3d at 797. "Our system of justice properly requires that civil litigants be assured the right to a fair trial." Id. (quoting

Hirschkop v. Snead, 594 F.2d 356, 373 (4th Cir. 1979) (en banc) (per curiam)). "Ensuring

fair trial rights is a compelling interest, however, only when there is a 'reasonable likelihood'

that a party would be denied a fair trial without the order under challenge." In re Murphy-

Brown, LLC, 907 F.3d at 797. Here, the defendants have failed to put forth sufficient facts

to show that there is a "reasonable likelihood" that they would be denied a fair trial absent a

gag order. Indeed, the only evidence offered is a handful of online articles, all of which

appear to have been published between April and June of 2018. The court in In re Murphy-

Brown, LLC, specifically critiqued the court below for imposing a gag order "without

adequate factual findings or development of a record." Id. at 798.

 The mere "fact of publicity is hardly dispositive," as "[p]ublicity often accompanies

trials, including trials in which the public has a keen and understandable interest." Id. "An

impartial jury, moreover, need not be wholly unaware of information—including potentially

prejudicial information—outside the record." Id. Rather, the court must decide whether—

through use of larger jury pools, jury instructions, voir dire, and other tools—it is likely that

this court "will be unable to guide a jury to an impartial verdict." Id. On this record, the

court finds that a gag order is unnecessary to ensure impartial adjudication.

 "Even when a gag order furthers a compelling interest, it must be the 'least restrictive

means' of furthering that interest." Id. at 799 (citing Ashcroft v. ACLU, 535 U.S. 564, 666

(2002)). Here, the defendants seek to prohibit presumably all "extrajudicial statements by

attorneys to the media, including, but not limited to, press conferences, press releases, or

interviews," without offering a single exception. Mem. in Support of Mot. to Prohibit

Extrajudicial Statements, ECF No. 70, at 2. The defendants also mention that the court

should restrict the activities of "counsel and those associated with them" without explaining who that phrase includes and excludes. Id. The court declines such an invitation to write a broad order when a gag order must, in order to survive strict scrutiny, "be 'narrowly tailored' to serve [its] intended purpose." In re Murphy-Brown, LLC, 907 F.3d at 799 (quoting Reed, 576 U.S. at 163).

In sum, the Fourth Circuit has made clear that "[g]ag orders should be a last resort, not a first impulse." Id. at 800. The defendants have failed to demonstrate why such an order is necessary and why less restrictive means cannot ensure fair adjudication. Accordingly, the court will **DENY** the defendants' motion to prohibit extrajudicial statements by attorneys.

## V.   CONCLUSION

For these reasons, the court will **DENY** the motion in limine to exclude Plunkett's statement, ECF No. 71; **GRANT** the motion for summary judgment on qualified immunity grounds, ECF No. 66; and **DENY** the motion to prohibit extrajudicial statements by attorneys to the media, ECF No. 69. An appropriate order will be entered.

Entered:   August 20, 2021

Michael F. Urbanski
Chief U.S. District
Judge
2021.08.20 09:26:44
-04'00'

Michael F. Urbanski
Chief United States District Judge

29